IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


DAVID M. PERRY,                                CV. 05-1212 KI

              Plaintiff,                       OPINION AND ORDER

        v.

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security,

                   Defendant.


KING, Judge:

## INTRODUCTION

Plaintiff David M. Perry ("Perry"), brings this action pursuant to the Social Security Act,

42 USC § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social

Security Administration ("Commissioner") denying his claim for Disability Insurance Benefits

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.
He is substituted as the defendant in this action pursuant to Fed. R. Civ. P. 25(d)(1) and 20 USC
section 405(g).

1  - OPINION AND ORDER

("DIB"), a period of disability, and Supplement Security Income ("SSI") disability benefits under

Titles II and XVI of the Social Security Act.  For the reasons set forth below, the decision of the

Commissioner is affirmed.

## PROCEDURAL BACKGROUND

In September 1999, Perry filed an application for disability insurance benefits under Title

II of the Act alleging disability since January 1, 1999.  Tr. 76-78.  This application was denied at

the initial administrative level of review in January 2000.  Tr. 40-43.  Perry did not request

reconsideration.

In April 2001, Perry filed a second application for DIB benefits.  Tr. 82-84.  Perry alleged

disability since June 30, 1999.  This application was initially denied in August 2001 and on

reconsideration in January 2002, and Perry did not request a hearing.  Tr. 44-47, 156.

Perry filed a third application for DIB and SSI benefits in April, 2002, alleging disability

since November 15, 2000 or June 30, 1999, due to bilateral ulnar nerve damage and carpal tunnel

syndrome, asthma, bronchitis, arthritis, bipolar disorder, anxiety, and obsessive compulsive

disorder.  Tr. 82, 127, 567, 568.  His  application was denied initially and upon reconsideration.

On January 21, 2004, a hearing was held before an Administrative Law Judge ("ALJ").   In a

decision dated March 11, 2004, the ALJ found Perry not disabled because he could perform his

past relevant work as a cashier, retail salesman, or telemarketer.  The Appeal's Council denied

Perry's request for review, making the ALJ's decision the final decision of the Commissioner.

Perry now seeks judicial review of the Commissioner's decision.

## STANDARDS

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert. denied*, 517 US 1122 (1996). The Commissioner bears the burden of developing the record.  *DeLorme v. Sullivan*, 924 F2d 841, 849 (9th Cir 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 USC § 405(g); *see also Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews*, 53 F3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986).  The Commissioner's decision must be upheld, however,  if  "the evidence is susceptible to more than one rational interpretation."  *Andrews*, 53 F3d at 1039-40.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 CFR §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999):

Step One.  The Commissioner determines whether claimant is engaged in substantial gainful activity.  If so, claimant is not disabled.  If claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate claimant's case under step two.  20 CFR §§ 404.1520(b), 416.920(b).

Step Two.  The Commissioner determines whether claimant has one or more severe impairments.  If not, claimant is not disabled.  If claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under step three.  20 CFR §§ 404.1520(c), 416.920(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether claimant's impairment "meets or equals" one of the impairments listed in the Social Security Administration ("SSA") regulations, 20 CFR Part 404, Subpart P, Appendix 1.  If so, claimant is disabled.  If claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of claimant's case proceeds under step four.  20 CFR §§ 404.1520(d), 416.920(d).

Step Four.  The Commissioner determines whether claimant is able to perform work he or she has done in the past.  If so, claimant is not disabled.  If claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of claimant's case proceeds under step five.  20 CFR §§ 404.1520(e), 416.920(e).

Step Five.  The Commissioner determines whether claimant is able to do any other work. If not, claimant is disabled.  If the Commissioner finds claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that claimant can do.  The Commissioner may satisfy this burden through the testimony of a

4  - OPINION AND ORDER

vocational expert ("VE") or by reference to the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates a significant number of jobs exist in the national economy that claimant can do, claimant is not disabled.  If the Commissioner does not meet this burden, claimant is disabled.  20 CFR §§ 404.1520(f)(1), 416.920(f)(1).

At steps one through four, the burden of proof is on the claimant.  *Tackett*, 180 F3d at 1098.  At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  *Id*

## ALJ's DECISION

At step one, the ALJ found Perry had not engaged in substantial gainful activity since the alleged onset of disability.  This finding is not in dispute.

At step two, the ALJ found Perry had the medically determinable severe impairments of asthma and ulnar nerve neuropathy. This finding is in dispute.

At step three, the ALJ found that Perry's impairments did not meet or medically equal a listed impairment.  This finding is not in dispute.

The ALJ determined that Perry  was able to perform a medium exertional level of work, and could occasionally climb ladders, ropes, or scaffolds, and could occasionally grasp.  The ALJ found that Perry should avoid fumes, odors, dusts, gases, poor ventilation, and other respiratory irritants.  This finding is in dispute.

At step four, the ALJ determined that Perry was able to perform his past relevant work as a cashier, retail salesman, or telemarketer.  As a result, the ALJ found Perry not disabled within the meaning of the Act.  This finding is in dispute.

/ / /

## FACTUAL BACKGROUND

Perry was born in 1963, and was 37 years old at the time of the first alleged onset of disability.  He completed high school and attended two years of college.[2]

The medical records in this case accurately set out Perry's medical history as it relates to his claim for benefits.  The court has carefully reviewed the extensive medical record, and the parties are familiar with it.  Accordingly, the details of those medical records will be set out below only as they are relevant to the issues before the court.

## DISCUSSION

Perry contends that the ALJ erred by:  (1) utilizing an improper legal standard in assessing disability; (2) finding he does not have a severe mental impairment at step two; (3) erroneously rejecting the opinions of Drs. Calkins, Hennings, Barry, and Rendleman; (4) erroneously rejecting lay testimony; (5) finding him not fully credible; and (6) relying on an inadequate hypothetical question to the Vocational Expert ("VE").

I. Legal Standards Regarding Disability

The ALJ stated that "after the date of alleged onset of disability, the claimant worked as a telemarketer on two occasions.  The jobs were part-time and his earnings did not rise to the level of substantial gainful activity.  The claimant has not engaged in substantial gainful activity since the date he alleges he became disabled."  Tr. 27-8.  The ALJ found that Perry had past relevant work, to which he could return, as a cashier, retail sales person, and telemarketer.  Tr. 34.

---

[2] Citations are to the page(s) indicated in the official transcript of the record filed with the Commissioner's Answer.

Perry accurately contends that his work as a telemarketer did not rise to the level of substantial gainful activity and therefore the ALJ erred when he considered it as past relevant work to which Perry could return. SSR 96-8p, p. 7, fn 2.  However, this error was harmless because the ALJ also found that Perry retained the ability to return to work as a cashier.  Perry does not contend that his work as a cashier did not constitute substantial gainful activity.

Plaintiff argues that the ALJ erred by relying upon the DDS doctors, because the forms filled out by the DDS doctors do not specify that the plaintiff is capable of sustaining work for eight hours a day, five days a week, or the equivalent.  However, plaintiff, not the ALJ, had the burden of showing that he was incapable of performing sustained work and that he was incapable of performing any of his past relevant work.  20 CFR §§ 404.1560(c)(1), 416.960(c)(1); *Barnhart v. Thomas,* 540 US 20, 25 (92003); *Burch v. Barnhart,* 400 F3d 676, 679 (9th Cir 2005).  The ALJ does not have the burden of proof at steps one through four, and need not solicit evidence to show that a claimant is capable of sustaining work.

II.    Step Two Legal Standards

At step two, the ALJ must determine whether the claimant has produced objective medical evidence of a "severe" impairment. *Bowen v. Yuckert,* 482 US 137, 140-41 (1987).  The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is "not severe."  According to the regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities."  20 CFR § 404.1521(a).  Basic work activities are "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling."  20 CFR § 404.1521(b).

7  - OPINION AND ORDER

The step two inquiry is a *de minimis* screening device to dispose of groundless claims. *Yuckert,* 482 US at 153-54.  An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual's ability to work."  *See* SSR 85-28; *Yuckert v. Bowen,* 841 F2d 303, 306 (9th Cir 1988) (adopting SSR 85-28).

A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, and cannot be established on the basis of a claimant's symptoms alone.  20 CFR § 404.1508.

Perry contends that the ALJ erred by failing to find that he had severe mental impairments at step two.  The ALJ properly determined that Perry had severe impairments at step two and continued the analysis.  Any error in failing to identify other limitations as "severe" at step two is therefore harmless.

III.  Physician Opinions

If a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight.  *Holohan v. Massanari,* 246 F3d 1195, 1202 (9th Cir 2001); 20 CFR § 404.1527(d)(2).   In general, the opinion of specialists concerning matters relating to their specialty are entitled to more weight than the opinions of nonspecialists.  *Id.;* § 404.1527(d)(5).   An ALJ may reject the uncontradicted medical opinion of a treating or examining physician only for "clear and convincing" reasons supported by substantial evidence in the record.  *Id.* at 1202, citing *Reddick v. Chater,* 157 F3d 715, 725 (9th Cir 1998).  If the treating physician's medical opinion is inconsistent with other substantial evidence in the record,

treating source medical opinions are still entitled to deference and must be weighted using all the factors provided in 20 CFR 404.1527. *Id.* citing SSR 96-2p. An ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if she provides "specific and legitimate" reasons supported by substantial evidence in the record. *Id.*

The ALJ correctly notes that the ultimate issue of disability is reserved to the Commissioner. 20 CFR § 404.1527(e). The physician's opinion must be considered in light of (l) the length of the relationship; (2) the kinds and extent of examinations and tests performed; (3) the supportability of the opinion by medical signs; (4) the consistency of the opinion with the record as a whole; (5) whether the source of the opinion is a specialist in the relevant area; and (6) the extent to which the source is familiar with other information in the case record. 20 CFR § 404.1527.

A. Examining Psychologist Roderick P. Calkins, Ph.D.

Perry argues that the ALJ failed to give adequate weight to the opinion of examining psychologist Roderick P. Calkins, Ph.D. Dr. Calkins examined Perry in December 1999. He diagnosed schizotypal personality disorder, rule out substance abuse, and assessed a Global Assessment of Functioning ("GAF") score of 50[3]. Tr. 374. Dr. Calkins administered the Wechsler Adult Intelligence Scale-III, the Wechsler Memory Scale-III, Part A and B of the Trail

---

[3]  The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000). It is essentially a scale of zero to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations. *Id* at 34. A Global Assessment of Functioning ("GAF") score between 41 and 50 indicates "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *Id.*

Making Test, the Reading and Arithmetic subtests of the Wide Range Achievement Test 3, and

the Minnesota Multiphasic Personality Inventory-2.  Dr. Calkins stated:

> Test results generally indicate that Mr. Perry has average cog-
> nitive abilities.  His academic achievement scores fall somewhat
> below average for his same-aged peers.  None of the scores are
> so severely deficit, however, that they would interfere with
> his ability to work.  He actually should have the cognitive
> abilities to learn new job tasks, be able to follow written in-
> structions, and should be able to master a number of jobs so
> long as they are not too complex or technical.

> Mr. Perry reports a history of alcohol and marijuana abuse as
> well as some other drug use in his teens or early twenties.  He
> tends to downplay the extent of his alcohol use but has been
> cited for three DUII's, with the most recent in January 1999.  He
> also has been incarcerated on several occasions, partly related to
> substance use.  Those working with him should be alert to the
> possibility that substance abuse may continue to be a contributor
> to the problems he reports.  If he is scheduled for a medical exam-
> ination, it might be a good idea to include a urinalysis....

> Mr. Perry presents as somewhat odd or peculiar in mannerism,
> expresses strong religious beliefs, but also expresses experiences
> that are beyond the norm.  Ideas of reference may have been
> present in his report although his thinking appeared fairly logical
> and straightforward.  He denies auditory hallucinations but does
> report some unusual visual experiences.  He reports some anxiety
> being around other people and also some periods where he gets
> depressed.  By throwing himself into a disciplined routine, he has
> normally been able to get himself out of his depressions.  Given
> the information available during this evaluation, his responding to
> the MMPI-2, and with his unusual presentation, it appears a diagno-
> sis of Schizotypal Personality Disorder is the most appropriate one
> currently.  There is the possibility that Mr. Perry is experiencing some
> more serious thought/delusional disorder and is not reporting the full
> extent of his symptoms currently.  It may also be that some of his
> difficulties and unusual experiences are being caused or at least
> exacerbated by his substance use.

> As to the question of whether Mr. Perry can work, he obviously has
> the cognitive skills to do so.  He is unusual and expresses a number

of unusual beliefs. Whether he would be able to tolerate proximity
to people and whether he would be able to conform to the social
standards of a work setting is questionable. It would possibly be a
good idea to have him enrolled in a substance abuse program with the
goal of obtaining abstinence.

Tr. 374-75.

The ALJ noted Calkins's question regarding whether Perry would be able to conform to
the social standards of a work setting, and concluded that Dr. Calkins's opinion "was provided a
year prior to the claimant's alleged onset date and is given little weight." Tr. 33.

Perry contends that a GAF score of 50 establishes disability. Plaintiff's Brief, p. 3.
This is not true. The GAF assessment requires the clinician to "Consider psychological, social,
and occupational functioning on a hypothetical continuum of mental health-illness. Do not
include impairment in functioning due to physical (or environmental) limitations." American
Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 4th Ed., p. 34 ("DSM-
IV"). Occupational impairment is only one of the possibilities upon which a GAF score may be
assessed. A GAF assessment is based either on the individual's symptoms or her functional
impairments. A GAF score of 50 does not, by itself, constitute conclusive evidence of disability
in the Social Security system.

Perry argues that he alleges disability commencing June 1999, six months before Dr.
Calkins's December 1999 evaluation, citing his April 2001 DIB application. Tr. 79. In the April
2002 application, currently before the court, Perry asserts that he became unable to work on April
25, 1992, and that he stopped working on November 15, 2000. Tr. 127. On April 30, 2002,
Perry asserted that he became unable to work on November 15, 2000. Tr. 82-84. In his April 30,
2002 SSI application, Perry asserted that he has been disabled since June 30, 1999. Tr. 568. The

11  - OPINION AND ORDER

ALJ rationally concluded that Perry's alleged onset date of disability was November 15, 2000.

Tr. 27.

Regardless of which onset date applies, the ALJ did not err by according Dr. Calkins's

opinion less weight because of the time between the evaluation and the alleged onset date.

Moreover Dr. Calkins did not opine that Perry could not sustain work.  Dr. Calkins stated that

Perry's symptoms might result from or be enhanced by substance abuse.  Dr. Calkins questioned

whether Perry would be able to tolerate proximity to people and the social standards of a work

setting, but he did not conclude that Perry would be unable to tolerate those situations.  The ALJ

had clear and convincing reasons to accord less than full weight to Dr. Calkins's opinion.

B.  Examining Psychologist Julia A. Wong-Ngan, Ph.D.

Dr. Wong-Ngan examined Perry in May 2002.  Tr. 466-74.  She administered the Mini

Mental Status Exam, Shipley Institute of Living Scale, Raven Standard Progressive Matrices,

Beck Depression Inventory-II, the Minnesota Multiphasic Personality Inventory-2, and the Beck

Anxiety Inventory.  Dr. Wong-Ngan noted that the test results indicated Perry had moderate

depression and severe anxiety.  Tr. 471.  She stated:

> He describes symptoms that appear most consistent with an
> obsessive-compulsive disorder....Overall, this condition appears
> relatively mild.  His symptoms do not cause significant functional
> impairment.  They have not interfered with previous employment.
> He does not appear to have significant mood problems.  In the
> last few years, due to situational stressors, he has felt some de-
> pression.  Nevertheless, he states that he is in a good mood most
> of the time.  He does not appear to have manic episodes.  He
> believes that he might have bipolar II disorder, suggested by a
> clinician a few years ago who performed a mental health exami-
> nation.  However, I am not convinced that he meets the criteria
> for this condition either.  He describes himself as an anxious
> person, but he does not appear to have clear panic attacks.  There

12  - OPINION AND ORDER

is no evidence of psychotic processes.  He has no history of sub-
stance abuse.

He appears most disabled by his physical conditions.  I would
recommend a physical examination...to determine the extent of
his physical limitations.  It is possible that stress amplifies his
physical problems, but there also appears to be a real medical
basis for them.  The prognosis appears guarded.  He reports 51
jobs in the last six years.  He states that most of them have
ended due to his arm problems.  Psychiatric problems have not
been a significant factor in his erratic work history these last
few years.  Nevertheless, due to increasing anxiety over his
situation, he might benefit from psychoactive medication.  By
reducing his overall level of anxiety, he might also see a re-
duction in his obsessive-compulsive traits and somatic focus.
Unfortunately, he is reluctant to take psychoactive medications
due to the side effect of sexual dysfunction....He may need to find
employment that does not require extensive use of his arms.

Regarding social security disability criteria, he appears mildly
impaired in ADLs, due to arm problems and OCD.  Social
functioning appears mildly impaired.  Concentration, persistence
and pace do not appear significantly impaired.  He has had no
psychiatric decompensations.  Substance abuse is not an issue.

Tr. 471-72.  She diagnosed Obsessive-Compulsive Disorder, mild, and assessed a GAF score of

55-60.  *Id.*  A GAF score of 51-60 reflects "Moderate symptoms (e.g., flat affect and

circumstantial speech, occasional panic attacks) OR moderate difficulty in social occupational, or

school functioning (e.g., few friends, conflicts with peers or co-workers).  DSM-IV, p. 34.  The

ALJ accorded "significant weight" to Dr. Wong-Ngan's opinion.  Tr. 34.

Perry argues that "the GAF score provided by Dr. Wong-Ngan (55-60) indisputably

establishes a severe impairment because it establishes that plaintiff's mental impairments more

than slightly impact his occupational functioning."  Plaintiff's Opening Brief, p. 5.  However, Dr.

13  - OPINION AND ORDER

Wong-Ngan specifically stated that psychiatric problems "have not been a significant factor" in

Perry's work history. Tr. 471.

Perry contends that Dr. Wong-Ngan's report establishes the presence of a severe mental

impairment. He argues that the ALJ failed adequately to consider Wong-Ngan's statement that

the MMPI-2 test results were valid and that:

> Seven of ten clinical scales were elevated. Such patients
> report significant levels of depression and anxiety. They
> report feelings nervous, agitated, tense and worried. They
> often worry excessively, and are vulnerable to real and
> imagined threat. They tend to overreact to minor stress.
> They also report sadness, fatigue, exhaustion and weakness.
> They have difficulty getting started on projects. They tend to
> be rather passive and docile individuals. They are plagued
> by self-doubts. They harbor feelings of inadequacy and in-
> security. They tend to elicit help from others. They have
> difficulty expressing their emotions. They may have limited
> psychological insight, and little understanding of their own
> motivations and feelings. They tend to internalize their
> feelings. Consequently, stress may manifest itself in heightened
> somatic focus. This profile is consistent with [Perry's] presen-
> tation.

Tr. 471. None of these feelings, symptoms or reactions described by Dr. Wong-Ngan constitute

functional limitations. Dr. Wong-Ngan herself concluded that Perry's obsessive compulsive

disorder was mild and that "his symptoms do not cause significant functional impairment." *Id.*

Perry argues that Dr. Wong-Ngan's opinion is internally inconsistent because she noted

test scores indicating depression and anxiety, but did not diagnose either condition. Careful

reading of her entire report reveals that the evidence before her was inconsistent. Test results

indicated depression and anxiety, but Perry did not have significant mood problems. Perry

described situational stressors, but stated that he was in a good mood most of the time. He had

14  - OPINION AND ORDER

no manic episodes or anxiety attacks.  Tr. 471.   Dr. Wong-Ngan's professional conclusions and

test interpretations are not inconsistent.

C.  Reviewing Psychologist Bill Hennings, Ph.D.

In January 2002 State agency psychologist Bill Hennings, Ph.D., reviewed Dr. Calkins's

report and opined that Perry had severe mental impairments that moderately limited his social

functioning and proscribed work requiring public contact or close coordination with co-workers.

Tr. 377-79, 388, 395.  Dr. Hennings's assessment was for the period of January 1, 1999 to

January 3, 2000.

In October 2002 Dr. Hennings reviewed the record again.  He found that Perry's mental

impairments were not severe from November 15, 2000, the alleged onset date of disability, to the

date of the report, October 14, 2002.  Tr. 480.  Frank Lahman, Ph.D., reviewed the records and

concurred with Dr. Hennings's conclusions in February 2003.  Tr. 480.

The ALJ noted that the opinions of Drs. Hennings and Lahman were consistent with that

of Dr. Wong-Ngan.  Tr. 30.

The ALJ did not err by relying on Dr. Hennings second opinion, rather than his first

opinion, when that second opinion was formed  with more information and closer in time to the

alleged onset date of disability.

D.  Examining Psychologist Steven P. Barry, Ph.D.

Steven Barry, Ph.D., examined Perry in April 2001 and in January 2004.  Tr. 399-409,

544-48.  In the first examination Dr. Barry conducted a clinical interview and administered the

Minnesota Multiphasic Personality Inventory-II ("MMPI"), the Woodcock Reading Mastery

Tests-Revised, reviewed records, and interviewed Perry's sister.  The MMPI results were invalid.

"There was an inordinately high level of symptom-endorsement."  Tr. 405.  Dr. Barry reported:

> I think he is presently unemployable.  I believe that he is experiencing
> a Bipolar Disorder, as well as some difficult and troublesome Axis
> II characteristics.  Since these are not presently being addressed in
> counseling [or] medication, I do not believe that these will simply
> abate and disappear.
>
> I do want to be clear that I think there are some confounding factors
> that need to be taking [sic] into consideration when determining
> whether or not he is a disabled individual.  There is the MMPI-2
> profile that he produced.  This is frequently referred to as a "fake
> bad" profile.  It is not to say that he is not experiencing serious
> psychological problems; however, he appeared to overinflate these
> and produced an invalid profile.  There is the complication of
> alcohol and other drug use.  He states no one has ever been con-
> cerned, his sister contradicts this.  He did not finish his Diversion
> program at NW Treatment Centers because of a UA dirty for
> marijuana and his justification that he was not going to let them
> take a lot of his money.  There is the issue of a huge amount of
> back child support that he owes.  As I understand David, if he
> goes to court with some proof that he is a disabled individual,
> he may be able to forego having to pay child support.
>
> There is the appearance of some presentation of information to put
> himself in the best light.  Note that he says that he has had 31 jobs
> since Costco; it is likely that he has had somewhere between 14
> and 17 jobs.  There is the complaint of a huge amount of pain and
> pain interference because of his arm and hand problems.  Then, his
> sister turns around and recalls a time that he had so much energy
> that he stayed up all night and then went golfing the next day.  I
> cannot explain this, other than to point out that this would not be
> a sport that I would expect him to undertake given his arm and hand
> complaints.
>
> . . .
>
> What I am not clear on is whether or not he is going to be disabled
> for the next 12 months....First of all, we do not know how he would
> do if on the appropriate medication and in some sort of mental health
> therapy.

16  - OPINION AND ORDER

Tr. 405-06.  Dr. Barry diagnosed alcohol and cannabis abuse, bipolar disorder, obsessive-compulsive disorder, pain disorder, narcissistic and antisocial personality characteristics, and assessed a GAF score of 50.  Tr. 407.

Dr. Barry evaluated Perry again in January 2004.  He conducted a clinical interview and reviewed his own file on Perry, but administered no tests.  He concluded that Perry "is totally disabled and unemployable."  Tr. 547.  He diagnosed bipolar disorder, and noted that Perry "reports history consistent with it not being controlled, including racing thoughts, occasional loss of the need to sleep, some low-grade hyper-religiosity, heightened sense of energy with little ability to accomplish things. Dr. Barry recorded continual problems with Perry being tangential, jumping from topic to topic, demonstrating pressured speech and the inability to get to the point. Dr. Barry stated that Perry's bipolar disorder was so severe that he could not "regularly look for work, let alone get a job and keep a job.  It causes difficulty with sustaining his concentration and attention, his tendency to ramble on and on and on and on, in my opinion, would be quite annoying to anyone around him in a workplace...."  Tr. 548.  Dr. Barry assessed a GAF score of 45.

The ALJ noted Dr. Barry's opinions, and gave them little weight as inconsistent with the treatment record, Perry's lack of treatment, and Perry's daily activities.  Tr. 30, 33. The ALJ properly noted that Dr. Barry's opinion is directly contradicted by Dr. Wong-Ngan's opinion.  If an examining doctor's opinion is contradicted by another doctor's opinion, the ALJ may reject it by providing specific and legitimate reasons that are supported by substantial evidence.  *Lester v. Chater,* 81 F3d 821, 830-31 (9th Cir 1995);  *Bayliss v. Barnhart,* 427 F3d 1211, 1216 (9th Cir 2005).  Because Dr. Wong-Ngan's opinion was based on independent clinical findings, the ALJ

17  - OPINION AND ORDER

had the discretion to disregard Dr. Barry's diagnosis. *Saelee v. Chater,* 94 F3d 520, 522 (9th Cir 1996).

In addition, in his first evaluation of Perry Dr. Barry expressed significant concern about the possible effects of substance abuse and administered several psychological tests.   In his second evaluation Dr. Barry did not address substance abuse or administer any tests.

The ALJ articulated specific and legitimate reasons supported by substantial evidence to reject Dr. Barry's conclusions.

D.  Examining Physician Neal J. Rendleman, M.D.

Neal Rendleman, M.D., examined Perry in October 1999.  Tr. 362.  Dr. Rendleman noted that Perry was seeking disability benefits because of pain and numbness in his arms and hands. Perry reported bilateral ulnar nerve transposition and median nerve surgery between 1993 and 1995.  Dr. Rendleman concluded Perry "meets criteria for disability.  However, objective evidence is needed via nerve conduction studies to verify that he truly does indeed suffer from neuropathy and that the surgeries have failed."  Tr. 362.

The ALJ appropriately gave Dr. Rendleman's disability opinion little weight because the subsequent nerve conduction studies were normal.  Tr. 32.  Nerve conduction studies of November 1999 showed no evidence of median or ulnar nerve compromise, and no evidence of peripheral polyneuropathy.  Tr. 365, 366.  In April 2001 electromyographical nerve conduction studies confirmed that there was "no electrophysiologic evidence of median nerve entrapment at the wrist or ulnar nerve entrapment at the elbow bilaterally."  Tr. 398.

The ALJ also noted other medical evidence that contradicted Dr. Rendleman's disability conclusion.  Marlon Michel, M.D., examined Perry in August 2002.  Tr. 475-79.  Perry reported

18  - OPINION AND ORDER

that he did yard work "w/o any problem." Dr. Michel found strong grip strength in both hands, and noted "Sensory exam: To pinprick was normal on the fingers and palms and on the arm. When I was writing letters on his palms he had absolutely no idea what I was writing. It seemed as if he was purposely saying the wrong things, because it would take him a moment to say something after I did it and I found that it was v. odd since he had normal sensation prior to this." Tr. 478. Dr. Michel found no muscle weakness or atrophy on the hands or arms.

Finally, William DeBolt, M.D., testified as a medical expert that, given the results of the nerve conduction studies, Perry did not have a diagnosis that would result in hand limitations precluding the ability to work. Tr. 609-10.

The ALJ had specific, legitimate, clear and convincing reasons supported by substantial evidence to reject Dr. Rendleman's conclusions.

IV. Lay Testimony

The ALJ must consider lay witness evidence and give germane reasons if he rejects it. *Bayliss,* 427 F3d at 1218. The ALJ may reject lay witness evidence that conflicts with the medical evidence. *Id.*

Ms. Dee Teeter, a friend of Perry's, testified at the hearing that Perry had lived in her home for about 20 months. Tr. 602. She testified that Perry "can't get up in the mornings," and that it is difficult for him to get ready for work because "he moves like an old man...." Tr. 604. Ms. Teeter testified that Perry talked excessively, and had great difficulty getting to the point. Ms. Teeter stated that she discouraged Perry from working in the kitchen because he dropped things, and that he would work in the yard for a short time but thereafter would stay in his bedroom for two or three days "because he just hurt all over. Especially his arms and hands." Tr.

19 - OPINION AND ORDER

605.  Ms. Teeter testified that Perry had no friends because "he drives them all crazy just rambling.  Talking."  Tr. 605-06.

Perry's parents stated that he talks excessively and dropped things frequently.  Tr. 258. His friend Brenda Wallace wrote that he talks excessively, can no longer participate in sports, and that he crys over small things.  Tr. 256-57.

The ALJ summarized the lay testimony, and  properly noted that it conflicted with the medical evidence. Tr. 32.  The ALJ's rejection of the lay evidence is supported by substantial evidence.

V.  Credibility

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F3d 1035, 1039 (9th Cir 1995). However, the ALJ's findings must be supported by specific, cogent reasons.  *Reddick v. Chater,* 157 F3d 715, 722 (9th Cir 1998).  Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear and convincing."  *Id.*  The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.  *Id.*  The evidence upon which the ALJ relies must be substantial. *Reddick,*  157 F3d at 724.  *See also Holohan v. Massinari,*  246 F3d 1195, 1208 (9th Cir 2001).  General findings (e.g., "record in general" indicates improvement) are an insufficient basis to support an adverse credibility determination.  *Reddick* at 722.  *See also Holohan,* 246 F3d at 1208.  The ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart,* 278 F3d 947, 958 (9th Cir 2002).

In deciding whether to accept a claimant's subjective symptom testimony, "an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms." [Footnote omitted.] *Smolen v. Chater,* 80 F3d 1273, 1281 (9th Cir 1996).

> Under the *Cotton* test, a claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged...." *Bunnell,* 947 F.2d at 344 (quoting 42 U.S.C. § 423 (d)(5)(A) (1988)); *Cotton,* 799 F.2d at 1407-08. The *Cotton* test imposes only two requirements on the claimant: (l) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom.

*Smolen,* 80 F3d at 1282.

The ALJ found Perry not credible. As to Perry's allegations of debilitating upper body pain, the ALJ noted the normal nerve conduction studies, the normal grip strength, the lack of atrophy, and the question of truthfulness raised by Dr. Michel. Tr. 32. The ALJ noted that Perry played golf and was meticulous about his hair and grooming.

The ALJ noted other inconsistencies between Perry's testimony and the record. He gave several conflicting statements about alcohol and drug use. He told Dr. Calkins that he had used marijuana, LSD, cocaine, and amphetamines. Tr. 370. He told Dr. Wong-Ngan that he had only used marijuana. Tr. 467.

The ALJ's credibility determination is supported by substantial evidence. Perry reported that he smoked marijuana daily in March 2000. Tr. 436-38. He reported planning to leave the country in order to avoid child support obligations and possible incarceration. Tr. 434. An April

2001 MMPI was invalid because of "inordinately high level of symptom endorsement."  Tr. 405.

In May 2002 Perry's counselor noted that he was "unmotivated," and that he didn't want

counseling, but wanted social security disability.  Tr. 506-07.  In June 2002 a counselor noted

that Perry "was quite clear that he is mostly seeking treatment to get GA cash benefits," and that

"malingering would need to be ruled out."  Tr. 520.  In a Work Tolerance Screening in March

2005, physicians noted "less than full effort given."  Tr. 265.

VI.  Vocational Expert Testimony

     Perry contends that the ALJ's hypothetical question to the vocational expert failed to

include all of his mental and physical limitations and was therefore inadequate.  As set out above,

the ALJ properly included all limitations properly supported by substantial evidence.

## **CONCLUSION**

     For these reasons, the court affirms the decision of the Commissioner and this case is

dismissed.

     IT IS SO ORDERED.

     Dated this ___12th___ day of June, 2007.


      /s/ Garr M. King_____
      GARR M. KING
      United States District Judge